Per Curiam.
 

 On the 3d of August, 1807, articles of agreement were made, signed, and sealed by Walter H. Overton and David Ross by Thomas Hopkins, his agent, in which it was stipulated that the said Walter H. Overton “ engages to locate, survey, and have carried into grants, 20,000 acres ofland warrants, to wit, Nos. 1,697, 1,698,1,688, and 1,691 for 5,000 acres each, m
 
 as 'good vacant land as his information serves, agreeable to the number of the location drawn,
 
 for which services and expenses, he, the said Thomas Hop
 
 *164
 
 kins, on behalf of David Ross, engages to convey to him, the said Walter H. Overton, or cause to be * conveyed by special warranty, the one fourth part of all the above-mentioned land so located and carried into grants, or parts thereof, which lands are to be divided agreeable to quantity and quality; and the aforesaid conveyances to be made as soon as the grants aré delivered for the aforesaid land. The contract was rescinded as to warrant No. 1,691, on the 21st of August, 1807. The contract was assigned on the 27th of April, 1809, by Overton to the complainant, Elihu S. Hall, and on the 14th of April, 1810, was resqinded by him and Hopkins, as agent for Ross, for 1,870 acres of warrant 1,679 ; and also, for 945 acres of the same warrant, on the 9th of June 1811. Overton made seven entries by virtue of the warrants, amounting to 11,325 acres, and procured grants to be issued thereon, which have now been produced in court. A division of the land is prayed for, and that one fourth part of each tract may be allotted to the complainant. The defendant opposes the prayer of the bill, and insists that the contract was made with Overton under an idea produced by his declarations that his knowledge of the country was extensive, and his information respecting the vacant lands good; and that he had executed the contract on his part, either unskillfully or unfaithfully, as the lands entered and granted are of little-or no value. By the testimony of Malcolm Gilchrist and Peter Singleton, taken by consent, it appears that of one tract, 5,000 acres, the northern part, from 500 to 1,000 acres of the land, is good, but part broken or rolling; the residue of the tract is unfit for cultivation, except about 200 acres interspersed through it in small pieces. About 2,000 or. 2,500 acres claimed by Simms, Whiteside, and Overton. A tract of 834 acres, is generally rocky land, soil good, but the greater part unfit for cultivation on account of its rolling and uneven situation. A tract of 166 acres is thin land, the greater part interspersed with rock, but in general level enough for * cultivation. By Singleton’s evidence, it appears that a tract of 2,500 acres on Rock Creek, is full of rock, cedars, and mountains, and not worth.more than the warrant. Of three tracts on Rock Creek, one of 640 acres, another of 1,060 acres, and the third of 1,125 acres, the quality is generally bad, being a quantity of rock, privy, and glades ; there is some good land on the creek, which runs through it and cuts up the good land. It
 
 *165
 
 also appears by Gilchrist’s deposition, that some time after he surveyed. the 5,000 acre tract, he informed Overton that the warrant ought to be drawn’, and laid on better land, who answered that the grant was out, and it was too late; that he was not bound to do it; was only bound to locate the warrant on as good land as he knew to be vacant; and either he did not like, or would not pay the expense, though Mr. Hopkins had requested him to do so, as the deponent thinks, before the grant issued. The land before described by these witnesses is the whole of what was located by Overton for David Ross, which, together with 7,815 acres for which the contract was rescinded, and 860 acres entered by Hopkins, amount to *20,000 acres, the quantity described in the contract. If a contract be unfairly obtained, or under suspicious circumstances, or if it be unjust, or unconscionable to assist it, or if it would be a hardship on the defendant to decree it, a court of equity will not interfere. The remedy is an extraordinary one, speaking with relation to the rules of the common law, which gives damages only from the time of the breach, not for the value at the time of the decree; whereas the decree for the specific performance gives the thing in specie, and if the party fail to execute the decree, of course damages from that time. For the decree creates a new duty which admits of no retrospection. .These principles are exhibited in Newland, 223, 226; C. T. Talbot, 234; 1 Ves. 219, 533; 2 Powell, 19, 21. The court will not be disposed to afford this extraordinary * remedy except in cases which, by extraordinary fairness, if we may use the expression, deserve it; and not only must the contract itself be fair in all its parts and aspects, but there must also be a performance, according to its true intent, and possessing all the qualities of the contract itself: a liberal performance, according to the just intent of the contract, considering the time, the plenty or scarcity of vacant lands at that time, and other circumstances of excuse which may in plain honesty be alleged. The assignee in equity stands in the place of the assignor; certainly in no better. Therefore dismiss the bill, with the costs to be paid by the complainant. His remedy at law is open to him.
 

 See, as to
 
 nature-of remedy by specific performance, Blair
 
 v.
 
 Snodgrass, 1
 
 Sneed, 1;
 
 when decreed,
 
 King’s Digest, 2857
 
 et seq.
 
 As to
 
 assignees,
 
 note to
 
 Kennedy
 
 v.
 
 Woolfolk,
 
 3 Hay. 195,
 
 sub fin.
 
 See King’s Digest, 2854, 2861, 2864, 2878, 2892.